## WILLIAM H. CLARK V. WASHINGTON LIBBEY.

OTTAWA TREATY OF 1862; *Lands Inalienable for Five Years.* Lands patented to the chiefs, councilmen and headmen of the Ottawa Indians, under the first clause of Article 3 of the Treaty with said Indians, proclaimed July 28, 1862, were inalienable to others than Ottawa Indians during the five years succeeding the ratification of such treaty.

*Error from Franklin District Court.*

EJECTMENT, brought by *Clark* to recover possession of 160 acres of land, to which he claimed title in fee and right of possession. *Libbey* denied plaintiff's title, and claimed title in fee himself. Trial at the November Term 1873. Findings and judgment in favor of *Libbey*, and plaintiff brings the case here for review. The facts are set forth in the opinion. No briefs on file.

*C. B. Mason,* and *A. W. Benson,* for plaintiff.

*Welsh & Meigs,* for defendant.

The opinion of the court was delivered by

BREWER, J.: This was an action of ejectment for a tract of land in Franklin county. Both parties claimed title under

the same patentee, one William Hurr, an Ottawa Indian. Defendant holds under a deed executed December 1st 1865; and the question is, whether this deed was void under art. 7 of the Ottawa treaty of 1862, (12 U. S. Stat. at Large, p. 1239.) There is no dispute, but that if this deed is void plaintiff's title is good and he ought to recover. It was conceded that William Hurr, the patentee, was a councilman and headman of the Ottawa Indians, and that the lands in controversy were patented under the provisions of art. 3 of the said treaty. The treaty provided in its first article that the Ottawa tribe should be dissolved at the expiration of five years from its ratification, and that the individual Ottawas should be deemed and declared to be citizens of the United States from and after that time. Article 3 reads as follows:

"It being the wish of said tribe of Ottawas to remunerate several of the chiefs, councilmen and headmen of the tribe, for their services to them many years without pay, it is hereby stipulated that five sections of land are reserved and set apart for that purpose, to be apportioned among the said chiefs, councilmen and headmen, as the members of the tribes shall in full council determine; and it shall be the duty of the Secretary of the Interior to issue patents in fee simple of said lands, when located and apportioned to said Indians."

Said article also grants to these parties, and to all heads of families, 160 acres, and to all other members of the tribe, 80 acres each. By art. 6, twenty thousand acres are given for the endowment, and one section for the site, of a school. Art. 7 provides that ten acres shall be set apart for the Ottawa Baptist church, and eighty acres to each of the two children of a former missionary among the Ottawas, which last two tracts are to be selected and located as the other allotments provided for are to be selected and located, and to be "inalienable the same as the land allotted to the Ottawas." It then continues as follows:

"And all the above-mentioned selections of lands shall be made by the agent of the tribe under the direction of the Secretary of the Interior. And plats and records of all the selections and locations shall be made, and upon their completion and approval proper patents by the United States

shall be issued to each individual member of the tribe, and person entitled for the lands selected and allotted to them, in which it shall be stipulated that no Indian, except as herein provided, to whom the same may be issued, shall alienate or incumber the land allotted to him or her in any manner until they shall by the terms of this treaty become a citizen of the United States; and any conveyance or incumbrance of said lands, done or suffered except as aforesaid by an Ottawa Indian, of the lands allotted to him or her, made before they shall become a citizen, shall be null and void."

Does this apply to the lands patented under art. 3? It seems to us that it does. It says, "All the above-mentioned selections." Upon what shall be founded an exception in favor of this selection? It must refer to lands selected under art. 3, because it speaks of allotments to Indians, and only in that article are such allotments provided for. Indeed there are no personal allotments provided for except in art. 3, and those to the children of the missionary, and as to them we have seen that it is expressly mentioned that they are to be inalienable the same as the allotments to the Ottawas. Referring then necessarily to selections under art. 3, and declaring that it embraces "All the above-mentioned selections," it must include this, unless there be something to make this an exception. It is said that the restriction contemplates some exception, because it says, "no Indian, except as herein provided," and that there can be no other exception than these selections for the chiefs, etc. The use of the term, "except as herein provided," would naturally refer to some express exception, and not to one arising by mere implication, and we find in the treaty as originally made by the Indians, the express exception, attached to the first article was a proviso, "that John T. Jones, now a member of the Ottawas, being an educated and experienced man, * * * is hereby declared to be a citizen of the United States, exempt from the restrictions hereinafter provided concerning the purchase, alienation, or incumbrance of the Ottawa lands." Here then was the express exception, and the only express exception, one which might properly be said to be "herein provided." When the

treaty was presented to the senate this proviso was stricken out, and the treaty as thus amended finally ratified. Striking out the proviso to which this term of exception could alone properly apply, did not have the effect of creating an exception elsewhere, but left the term nugatory and meaningless. Again, it is said that patents are to be issued for these lands in fee simple, and this implies a full title, free from any restrictions upon alienation. This expression, at least when used in Indian treaties, carries no such necessary implication. See the briefs of counsel and the opinion of the court in the case of *Blue Jacket v. Comm'rs of Johnson County*, 3 Kas., 299, and the subsequent opinion of the supreme court of the U. S. reversing this case, *The Kansas Indians*, 5 Wallace, 737. Again, it is said that this restriction only applies to selections made by the agent, and that the selections for the chiefs, etc., were to be made by the Indian council. We do not so understand the treaty. The seventh article declares that "all the above-mentioned selections of lands shall be made by the agent;" while article 3 does not provide for any selection. It says that five sections are to be apportioned among the chiefs, etc., as the council shall determine. This we understand to mean that the council shall determine the amount each chief and councilman shall receive. It also provides that the Secretary shall issue patents "of said lands when located and apportioned." The location is not given to the council, only the apportionment.

It follows from these considerations that the restrictions of art. 7 applied to this land, and that the deed under which the defendant holds is null and void. The judgment of the district court must therefore be reversed, and the case remanded for a new trial.

KINGMAN, C. J., concurring.